# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0316-22

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

KYRIAKOS SERGHIDES,
a/k/a KYRIAKOS SEGHIDES,

    Defendant-Appellant.

_____

Submitted January 27, 2025 – Decided August 1, 2025

Before Judges Sabatino, Jacobs and Jablonski (Judge Sabatino concurring).

On appeal from the Superior Court of New Jersey, Law Division, Morris County, Indictment No. 16-08-0730.

Jennifer N. Sellitti, Public Defender, attorney for appellant (Amira R. Scurato, Designated Counsel, on the brief).

Robert J. Carroll, Morris County Prosecutor, attorney for respondent (Erin Smith Wisloff, Legal Assistant, on the brief).

PER CURIAM

Following a jury trial, defendant Kyriakos Serghides appeals from convictions for various crimes, including sexual assault, endangering the welfare of a child, attempted kidnapping, luring, and attempted sexual assault, all involving two minor victims in separate incidents occurring at public retail locations. Evidence presented at trial persuaded jurors that, in August 2015, defendant committed a sexual assault against five-year-old J.Y.[1] in a mall restroom. Fewer than two weeks later, in September 2015, defendant attempted to lure and kidnap five-year-old P.H. from a local Target store, threatening him with violence. Aspects of both incidents were captured on surveillance footage and corroborated by multiple eyewitnesses, including a mall employee, security personnel, and the victims themselves. Defendant's statements to police, given following Miranda[2] warnings, were admitted with redactions in evidence at trial.

On appeal, defendant challenges his convictions and sentence, advancing claims of evidentiary and procedural errors, improper joinder of charges, insufficiency of evidence, and cumulative errors. Defendant further contends his sentence is excessive. We reject defendant's contentions and affirm in all respects.

---

[1] We use initials pursuant to R. 1:38-3(c)(9) and (12).

[2] Miranda v. Arizona, 384 U.S. 436 (1966).

2

I.

The First Incident

On August 28, 2015, at around 7:30 p.m., five-year-old J.Y. was at the Rockaway Townsquare Mall with his mother, A.B., and his two sisters. When J.Y. told his mother he needed to use the bathroom, his older sister offered to accompany him. A.B. assumed they would both go into the ladies' room, but instead J.Y. entered the men's restroom while his sister waited outside.

When J.Y. went into the men's room, he saw a man using the small urinal typically reserved for children. As a result, J.Y. chose to use a larger urinal. After finishing, the man stepped away from the small urinal and walked behind J.Y. The man reached out, touched J.Y.'s genitals, and said, "There we go." He also "nibbled" on J.Y.'s right ear. Later at trial, J.Y. identified defendant as the person who had committed those acts.

At around the same time, J.M., a cleaner at the Rockaway Mall, was mopping the floor near the carousel when she saw a man exit the men's restroom and bump into her water cart. She recognized him as someone she had seen about twice a week over the past year, usually sitting at the food court. She later told police that, after the collision, the man quickly jumped over the water cart and "took off running toward the center of the mall."

3

Meanwhile, J.Y. left the restroom and found his mother. At trial, A.B. testified that J.Y. appeared "very pale" and his eyes were "bugged out, like something happened." He repeatedly said that "he shouldn't have come," that he "didn't want to be there," and that he wanted his father. When asked what was wrong, J.Y. told A.B. that "somebody touched him." A.B. "scooped [J.Y.] up," approached a security guard, and asked for the police to be called.

Police responded to the scene. Sergeant Marshall Wang of the Morris County Prosecutor's Office interviewed J.Y. The interview was audio- and video-recorded. During the interview, J.Y. described the assault, stating that the man touched his "pee-pee" with his hand. J.Y. also noted that the man had a band-aid on his finger and described him as a white male wearing a white shirt and glasses.

Police obtained surveillance footage from Nori Sushi, one of the restaurants located in the mall's food court. The video was later shown to the jury during the trial. Sergeant Wang testified that the Nori Sushi video captured a man walking toward the restroom. Sergeant Wang described him as wearing a dark-colored shirt, dark shorts, and dark sneakers with lighter-colored socks visible above the shoes. Wang also noted that the man "had a pretty distinct gait . . . where the arms swung further than normal." J.M. also gave a statement to

A-0316-22

police, describing the suspect as a tall, thin white man, wearing a long-sleeve t-shirt, with dirty white sneakers. He had blue eyes, dark blonde short hair with curls in the front, and was wearing shorts with two pockets. She said he "smelled somewhat bad." J.M. estimated his age at forty to forty-five years old, but at trial revised that estimate to thirty to forty years old. At trial, J.M. identified defendant as the man she saw.

The Second Incident

On September 10, 2015, at around 6:00 p.m., five-year-old P.H. visited the Target store in Rockaway with his parents and two sisters. While P.H. was with his father and older sister in one area of the store, his mother and twin sister were elsewhere. At one point, P.H. wandered away from his father and into the Lego Star Wars toy aisle, where a man approached him and asked if he wanted to see where more toys were. P.H. agreed and followed the man.

At the same time, J.R., a security guard at Target, was monitoring the store's surveillance cameras. J.R. began closely observing the individual on the cameras. During the trial, footage from those cameras was shown to the jury. He saw the man pick out a piece of candy, pay for it, and head toward the exit—only to turn around just before leaving and walk back into the store.

5

J.R. continued watching as the man walked to the electronics section and then into the Lego toy aisle. There, J.R. witnessed the man speaking with a young child. This raised J.R.'s suspicions because he had seen the man enter the store alone. As the man began walking toward the front of the store, it appeared to J.R. that he was trying to lead the child out with him.

Concerned, J.R. left the surveillance room and instructed a coworker to "make her presence known" near the exit doors by guest services. He then approached the suspect, positioning himself between the man and the child. J.R. asked the child for his name and whether he was alone or with his parents. According to J.R., the child appeared "really nervous" and "really scared." J.R. then escorted the boy to the guest services area and used the store's intercom system to call for his father.

Meanwhile, the suspect exited the store, crossed the street, and got into a vehicle. At trial, J.R. identified defendant as the man he had seen on the security footage.

After being reunited with his son, the child's father called his wife and told her that "something had happened to [P.H.]" and that she should meet them at the front of the store. When she arrived, she found their son visibly upset, "very nervous" and "very shaken up." When she asked what had happened, the

6

boy explained that while he was looking at Star Wars toys, a man approached and told him, "I know where there's more Star War[s] toys." The boy followed him. When his mother asked why he would do that, P.H. said, "Well, I tried to stop, but then he told me if I didn't go with him, he will cut me into pieces." The police were contacted, and P.H. gave a statement later that evening.

Separately, D.C., a security officer working the 3:00 p.m. to 11:00 p.m. shift at the Rockaway Mall on September 10, 2015, had been briefed on the incident of August 28 and police shared the Nori Sushi footage that showed a suspect. Shortly after the Target incident, D.C. noticed a man near the Apple Store who resembled the suspect. D.C. related that the man had a distinctive gait, swinging arms as he walked in a manner D.C. likened to "how Bigfoot walks." This detail matched what was seen in the surveillance footage, prompting further investigation.

D.C. made eye contact with the individual, who then promptly exited the mall. Suspecting the man to be the person depicted in the Nori Sushi video, D.C. contacted his supervisor and began following him. Using his cellphone, D.C. photographed the individual. He observed the man walk to his vehicle and video-recorded the vehicle's license plate number. According to D.C., the man then "sped off away very quickly through the parking lot." D.C. provided this

7

information to law enforcement. At trial, D.C. identified the individual he had observed as defendant and further confirmed that defendant was the same person depicted in the Nori Sushi surveillance footage.

On receiving the license plate information, police determined it was registered to a vehicle belonging to defendant. Detectives subsequently prepared a photo array consisting of six photographs, including that of the defendant. The array was administered on September 10 and September 11, 2015, by an officer with no prior involvement in the investigation. It was also shown to several witnesses: J.Y., his sister, P.H., J.R., and an individual who had witnessed the August 28 incident. J.Y., P.H., and J.R. each positively identified defendant's photograph. The remaining witnesses did not make an identification.

Rockaway Township Detective Thomas Takacs, who was familiar with the defendant from his frequent visits to the QuikCheck in Rockaway— approximately once every two weeks over the prior year to eighteen months— reviewed the video footage from Nori Sushi and Target, as well as defendant's driver's license photo on the evening of September 10, 2015. Based on his observations, Takacs concluded that all three images depicted the same individual. He noted several distinguishing characteristics shared by the men in

8

the videos and the license photo, including "distinct long arms," "a hunch in his back," a "distinct curvature" in the "upper shoulders and back," as well as a "similar walk." He also observed that the man in the Nori Sushi footage wore clothing similar to that of the man in the Target footage, including "distinct black shoes and short white socks."

Later that evening, Detective Takacs and Detective Stephanie Merced of the Morris County Prosecutor's Office, a Spanish-speaking officer, went to the Rockaway Mall to interview J.M. Detective Merced showed J.M. defendant's driver's license photograph. On viewing the photo, J.M. immediately identified the individual depicted. As recorded, J.M. grabbed the photograph and exclaimed, "This is him, how did you find him?"

Arrest, Interrogation, Indictment

Police placed defendant under surveillance. On the morning of September 11, 2015, they saw the defendant leave his apartment and go to QuikCheck. There, the police—confirming his distinctive gait and vehicle information—arrested him. In a search incident to arrest, police found a folding pocketknife on defendant's person. Defendant stated, "That's my knife, I have it on me all the time." Defendant was then taken to the Rockaway Township Police Department, where he signed a Miranda waiver form, agreeing to an interview

9

with Detectives Wang and Takacs. The interview was both audio- and video-recorded, and later played for the jury at trial.

In his statement, defendant explained that although he had worked as a security guard at Rockaway Mall "years back," he denied frequenting the mall. When asked about his activities the previous evening, defendant stated that he drank in the early afternoon, went to the mall to try to replace his cell phone battery, visited Target, and then went home and fell asleep.

Regarding his interaction at Target, defendant described noticing a lost child and offering to walk him to the front of the store. He said the child followed him briefly, but then disappeared when he turned around. Afterward, defendant left the store, smoked a cigarette, and went home, where he drank and went to sleep. He estimated the child to be about five years old.

When further questioned about his presence at the Rockaway Mall and any contact with children there, defendant stated he had only been to the mall a few times over the summer and denied interacting with any child in the mall bathroom. After police informed defendant he was identified by a child, he responded, "I didn't do anything. No idea what you're talking about."

Detective Takacs asked defendant if he had been drinking the day he was giving a statement. Defendant denied drinking that day. He also repeatedly

denied threatening the child in Target with a knife or running out of the store. He explained that the child "just walked away, so I figured okay. He's taking care of himself, I guess." Defendant added that he would only use his knife for self-defense if he were "cornered and there's like two or three people or somebody else is armed and coming after me."

Detectives then questioned defendant about his presence at Rockaway Mall on the previous Friday. Defendant claimed he was "in the parking lot the whole time basically looking for my car" because he was supposed to give someone a ride from Pennsylvania but forgot where he parked. He denied touching a boy's penis in the bathroom, stating, "I probably fixed my hair, washed my hairs [sic] or something and left," but maintained he did not remember actually using the urinal.

Police also searched defendant's car, where they found a child's car seat. Police searched defendant's residence and found another knife and a machete, as well as a black suitcase with multiple pairs of black shoes and an unspecified toy in the closet.

When the investigation concluded, defendant was arrested and the case presented to a grand jury. On September 29, 2016, a Morris County grand jury returned an indictment charging defendant with multiple offenses stemming

11

from the incidents at the Rockaway Mall and Target in Rockaway Township, involving three minors J.Y. and P.H., and J.L.[3]  The indictment charged second-degree sexual assault of a child (J.Y.), N.J.S.A. 2C:14-2(b) (count one); third-degree endangering the welfare of a child (J.Y.), N.J.S.A. 2C:24-4(a)(1) (count two); second degree attempted kidnapping of a child (P.H.), N.J.S.A. 2C:13-1(b)(1)/2C:5-1(a)(3) (count five); second-degree luring of a child (P.H.), N.J.S.A. 2C:13-6 (count six); second-degree attempted sexual assault of P.H., N.J.S.A. 2C:14-2(b)/2C:5-1(a)(3) (count seven); third-degree endangering the welfare of a child (P.H.) , N.J.S.A. 2C:24-4(a)(2) (count eight); third-degree terroristic threats against (P.H.), N.J.S.A. 2C:12-3(a) (count nine); third-degree possession of a weapon (folding knife) for an unlawful purpose (against P.H.), N.J.S.A. 2C:39-4(d) (count ten); and fourth-degree unlawful possession of a weapon (folding knife), N.J.S.A. 2C:39-5(d) (count eleven).

Severance Motion

Prior to trial, defendant moved to sever counts one through four from counts five through eleven of the indictment.  Counts one and two related to the

---

[3]  Counts three and four pertain to a third alleged victim, J.L., and were dismissed by the State prior to trial, as J.L. did not wish to testify.  Those counts are not the subject of this appeal, and in the interest of brevity, we redact their reference from the procedural history.

sexual assault of J.Y. at the Rockaway Mall bathroom, and counts five through eleven related to the incident at Target. Defendant argued that trying him for all acts together would be unduly prejudicial, that the incidents were not "the same or similar in character," and were not part of a "common scheme or plan." In opposition, the State argued that the acts were indeed intertwined and indicated a common scheme or plan. The State further contended that video evidence from both incidents confirmed defendant's identity. In addition, the witness identifications related to each incident—and, in the case of the Target video, evidence of the defendant's intent, motive, and absence of accident or mistake—weighed against severance. Moreover, the State posited that if the counts were severed, evidence of defendant's actions in the mall bathroom would be admissible under N.J.R.E. 404(b) at the trial relating to the Target incident, compelling J.Y. to testify twice.

In an oral decision issued on October 12, 2021, the court noted that although joinder is favored, this would "not override a defendant's right to a fair trial." In determining whether prejudice to defendant warranted severance of the charges, the court considered whether "evidence of the offenses sought to be severed would be admissible under" N.J.R.E. 404(b), and the four-factor test for admission set forth in State v. Cofield, 127 N.J. 328, 338 (1992). The court

13

found that all of the counts in the indictment "met the standard of Rule 3:7-6 for joinder in the same indictment" as they were of the same or similar character. Still, the court noted it was the State's burden to establish the admissibility of the other crimes evidence under N.J.R.E. 404(b). The court rejected the State's argument that the evidence of the Target incident, which resulted in the identification of defendant, was "intrinsic" to the other counts of the indictment. In examining the Rule 404(b) and the Cofield factors, the court found that "the evidence concerning the [d]efendant's alleged sexual contact with J.Y." in the mall bathroom on August 28, 2015 "is plainly relevant to the hotly disputed issue of [d]efendant's state of mind – and by that I mean his intentions, his purposes, his motives – thirteen days later on" September 10, 2015 in Target. However, the court found that such evidence was "not probative" of defendant's "preparation for or . . . planning for" the incident at Target.

> To the contrary, the contrast between the alleged conduct on August 28th and September 10th of 2015, the former involving touching young boys' penises, again allegedly, and then fleeing, and the latter involving an attempt to kidnap a young boy and then to later sexually assault that boy shows a change in strategy certainly and/or tactics, although albeit for the same motive and purposes, sexual arousal and gratification.

Thus, the court found that the first <u>Cofield</u> prong "weighs strongly against excluding and in favor of including" the evidence relevant to the first four counts in a trial on counts five through eleven.

With respect to the second <u>Cofield</u> prong, the court found that the incidents were reasonably close in time to each other, although not similar in conduct. The court therefore concluded the second prong "also counsels against exclusion and in favor of inclusion." Regarding the third prong, the court found that the State had "shown evidence rising to the clear and convincing level" of "the alleged criminal conduct" at the mall on August 28, 2015, given the surveillance video and J.M.'s eyewitness account, as well as the identification of defendant by the child victim. Finally, balancing the probative value of the proffered evidence versus the prejudice to defendant under the fourth <u>Cofield</u> prong, the court concluded that the probative value of the evidence of the mall bathroom incidents "far outweighs risk of undue prejudice to the [d]efendant." As the court noted, defendant "will have a full and fair opportunity to" contest that evidence, and any risk of prejudice would be "mitigated by limiting instructions to the jury concerning proper and improper uses of the evidence both at the time of admission of the evidence and during the final jury instructions."

15 A-0316-22

<u>Wade/Henderson</u>

Defendant also moved pretrial for a <u>Wade/Henderson</u> hearing[4] to challenge the suggestiveness of identification procedures employed.  On March 12, 2021, the motion judge issued an order denying the motion, without prejudice, concluding that "the court did not find the proffer made by the defendant sufficient to justify an evidentiary hearing pursuant to the <u>Henderson</u> criteria; this determination was <u>without prejudice to an amplified proffer</u>." (Emphasis in original).

Defendant renewed his motion for a <u>Wade/Henderson</u> hearing, and the court addressed it on October 12, 2021, the same day it ruled on the severance motion.  The court found the identification of defendant made by J.M. to be "confirmatory," because J.M. was familiar with defendant, having seen him at the mall approximately twice per week for a year.

After reviewing pertinent case law, the court ruled,

> I find and conclude that none of the . . . procedures were suggestive in any way.  To the contrary, I find that each of the . . . identification procedures was conducted in a manner that was nonsuggestive and that there were no indicia o[f] suggestiveness or any other reason to call into question the reliability or trustworthiness of any of

---

[4] <u>United States v. Wade</u>, 388 U.S. 218 (1967); <u>State v. Henderson</u>, 208 N.J. 208 (2011).

A-0316-22

the . . . identifications of [d]efendant by, again, these child alleged victims.

Noting that a threshold of impermissible suggestiveness was required to warrant a hearing and the absence of suggestiveness found, the court denied the request for a Wade/Henderson hearing.

### Admission of Statements

The State moved to admit defendant's statements to police, and to admit statements of the juvenile victims pursuant to N.J.R.E. 803(c)(27) (tender years) and N.J.R.E. 803(c)(2) (excited utterance). On September 10, 2019, the court issued an order accompanied by a written statement of reasons granting the State's motion to admit defendant's statements, and granting in part and denying in part, the State's motion to admit the statements of the juvenile alleged victims. At a pre-trial hearing on September 13, 2021, the trial judge refused to revisit the previous judge's ruling on the admissibility of defendant's statements to police.

### Trial and Sentence

A jury trial was conducted over seven days in February 2022. Defendant did not testify nor call any witnesses. At the close of the State's case, defendant moved for a judgment of acquittal under Rule 3:18-1 and State v. Reyes, 50 N.J. 454 (1967), which the trial court denied.

On February 10, 2022, the jury convicted defendant, with respect to victim J.Y., of second-degree sexual assault and third-degree endangering the welfare of a child. As to victim P.H., defendant was convicted of second-degree attempted kidnapping, second-degree luring, second-degree attempted sexual assault and third-degree endangering the welfare of a child. The jury acquitted defendant of third-degree terroristic threats, third-degree possession of a weapon for an unlawful purpose, and fourth-degree unlawful possession of a weapon.

The court sentenced defendant to an aggregate eighteen-year term of imprisonment, consisting of two consecutive nine-year terms for second-degree sexual assault and second-degree attempted kidnapping, subject to parole ineligibility under the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2, and imposed mandatory fines and penalties.

On appeal, defendant raises the following arguments:

POINT I

BECAUSE DENIAL OF DEFENDANT'S MOTION FOR SEVERANCE WAS A CLEAR ERROR OF JUDGMENT, THE RESULTANT JOINDER OF OFFENSES AT TRIAL LED TO AN UNJUST RESULT AND DENIED DEFENDANT A FAIR TRIAL. (Raised Below) FURTHER, NO LIMITING INSTRUCTIONS WERE GIVEN. (Not Raised Below)

(A) Denial Of Defendant's Motion For Severance Was A Clear Error of Judgment.

(B) Fatally, No Limiting Instructions Were Provided To Guide The Jury In Proper Evaluation Of The Evidence From The Two Incidents. (Not Raised Below)

POINT II

INSUFFICIENT PROOFS WERE PRESENTED FOR THE TARGET INCIDENT AND THE MOTION FOR A DIRECTED VERDICT SHOULD HAVE BEEN GRANTED.

POINT III

DEFENDANT'S CONSTITUTIONAL RIGHT TO REMAIN SILENT AND HIS RIGHT TO COUNSEL WERE VIOLATED, RENDERING HIS STATEMENT INADMISSIBLE.

POINT IV

LAW ENFORCEMENT IMPROPERLY IDENTIFIED DEFENDANT IN VIDEO AND PHOTOGRAPHIC EVIDENCE AND IN COMPARISONS THEREOF, AND THE STATE IMPROPERLY BOLSTERED THAT IDENTIFICATION.

POINT V

IMPROPER ADMISSION OF UNCHARGED AND PREJUDICIAL EVIDENCE DENIED DEFENDANT A FAIR TRIAL.

POINT VI

DEFENDANT'S CONVICTIONS SHOULD BE REVERSED FOR CUMULATIVE ERROR. (Not Raised Below)

POINT VII

THE TRIAL COURT MADE A NUMBER OF ERRORS IN FINDING AND FAILING TO FIND AND IN WEIGHING AGGRAVATING AND MITIGATING FACTORS AND INAPPROPRIATELY RAN THE TWO SENTENCES CONSECUTIVELY, RESULTING IN AN EXCESSIVE SENTENCE.

II.

Severance

On appeal, defendant again challenges the trial court's denial of his motion to sever the counts related to each child victim. He asserts that trying the Rockaway Mall and Target incidents together resulted in undue prejudice and that the court failed to provide sufficient limiting instructions concerning other-crimes evidence. Following conviction, defendant advanced substantially similar arguments in his motion for a new trial. In denying the motion for a new trial, the trial court found that "the prosecutors here made no misstatements about the anticipated trial evidence" and that the proofs regarding the sexual assault of J.Y. were "exceptionally strong." The court said it had conducted a "careful and rigorous" Cofield analysis, and continued:

20

In this case I did find pretrial and I continue to find now a very clear and quite strong logical connection between the J.Y. allegations, and the P.H. allegations. Again, I incorporate -- I refer to and I incorporate by the reference my pretrial reasons for finding that clear strong logical connection. In a nutshell, the evidence of defendant's sexual assault of J.Y. on August 28th of 2015 was clear and strong evidence of defendant's motive, purpose, and intent in attempting 13 days later to kidnap P.H. from the Target store.

With respect to the [c]ounts involving P.H., defendant's state of mind was the key issue. There was no dispute that defendant interacted with P.H. at the Target store, with P.H. then following the defendant going towards the front of the Target store. The jury convicted defendant on the attempted kidnapping, luring, attempted sexual assault, and endangering the welfare of the child charges involving P.H., rejecting the defendant's statements to law enforcement that he was merely trying to help a boy who seemed to be lost.

Now with respect to defendant's motive, purpose, and intent on September 10th, 2015 while at the Target store, the evidence of the sexual assault of J.Y. 13 days earlier, which evidence I viewed as quite strong, both at the time I was deciding the pretrial severance motion, and after hearing the actual trial evidence, that evidence clearly and strongly indicates an escalation of defendant's criminally sexually unlawful conduct. The touching of the penis of a young boy in a mall bathroom, followed by immediate hasty flight is a short[-]lived fleeting ephemeral type of sexual misconduct, and gratification. In contrast, kidnapping a boy for sexual assault purposes is a significant escalation, and if successful would have provided the perpetrator with greater opportunity for deviant sexual

21

gratification. I view these inferences as quite clear, strong, and logical.

We agree with the trial court's analysis. <u>Rule</u> 3:7-6 provides:

> Two or more offenses may be charged in the same indictment or accusation in a separate count for each offense if the offenses charged are of the same or similar character or are based on the same act or transaction or on 2 or more acts or transactions connected together or constituting parts of a common scheme or plan. Relief from prejudicial joinder shall be afforded as provided by <u>R.</u> 3:15-2.

<u>Rule</u> 3:15-2(b) permits the court to sever the trials of counts or defendants "or direct other appropriate relief" if for any reason "it appears that a defendant or the State is prejudiced by a permissible or mandatory joinder of offenses or of defendants . . . ."

"Although joinder is favored, economy and efficiency interests do not override a defendant's right to a fair trial." <u>State v. Sterling</u>, 215 N.J. 65, 72 (2013). "The test for assessing prejudice is 'whether, assuming the charges were tried separately, evidence of the offenses sought to be severed would be admissible under [N.J.R.E. 404(b)] in the trial of the remaining charges.'" <u>Id.</u> at 73 (alteration in original) (quoting <u>State v. Chenique-Puey</u>, 145 N.J. 334, 341 (1996)). "If the evidence <u>would be admissible at both trials</u>, then the trial court may consolidate the charges because 'a defendant will not suffer any more

22

prejudice in a joint trial than he would in separate trials.'" State v. Smith, 471 N.J. Super. 548, 567 (App. Div. 2022) (emphasis in original) (quoting Chenique-Puey, 145 N.J. at 341). Thus, the requirements of N.J.R.E. 404(b) "must be met . . . and the evidence of other crimes or bad acts must be 'relevant to prove a fact genuinely in dispute and the evidence is necessary as proof of the disputed issue[.]'" Sterling, 215 N.J. at 73 (quoting State v. Darby, 174 N.J. 509, 518 (2002)).

N.J.R.E. 404(b) provides that "evidence of other crimes, wrongs or acts is not admissible to prove a person's disposition in order to show that on a particular occasion the person acted in conformity with such disposition[,]" but it "may be admitted for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident . . . ." Under Cofield, in order for evidence to be admissible under N.J.R.E. 404(b), it must satisfy the following four-prong test:

> (1) The evidence of the other crime must be admissible as relevant to a material issue;
>
> (2) It must be similar in kind and reasonably close in time to the offense charged;
>
> (3) The evidence of the other crime must be clear and convincing; and

(4) The probative value of the evidence must not be outweighed by its apparent prejudice.

[127 N.J. at 338.]

"The decision whether to sever an indictment rests in the sound discretion of the trial court." Chenique-Puey, 145 N.J. at 341. "An appellate court will defer to the trial court's decision, absent an abuse of discretion." Ibid. "[S]ensitive admissibility rulings regarding other-crimes evidence made pursuant to Rule 404(b) are reversed '[o]nly where there is a clear error of judgment.'" Smith, 471 N.J. Super. at 568 (quoting State v. Green, 236 N.J. 71, 81 (2018)). "However, '[t]hat deferential approach does not fit in cases where the trial court did not apply Rule 404(b) properly to the evidence at trial;'" in such circumstances, the appellate court "may engage in its own 'plenary review' to determine its admissibility." Ibid. (quoting State v. Rose, 206 N.J. 141, 158 (2011)).

In support of his argument that the trial court erred in denying his severance motion, defendant primarily relies on Smith, 471 N.J. Super. at 548, in which defendant who lived with his girlfriend was tried for sexual offenses against both K.W., his own daughter, and S.E., the daughter of his girlfriend. The Smith court held that defendant should have been tried separately for the offenses relating to the separate victims. Id. at 574.

24

In Smith, S.E. reported to her mother that defendant had "touched her private part" when he came into her bedroom. Id. at 561. S.E. later told police that defendant touched her private part on numerous other occasions. Id. at 560. A doctor later discovered that K.W. had gonorrhea. Id. at 561. In response to etiological inquiry, K.W. said that defendant had sexually assaulted her on several occasions during the prior two years. Id. at 556.

At trial, defendant denied all of K.W.'s and S.E.'s allegations. He claimed that, on the evening S.E. first accused him, he told her to move so he could lay the baby down, but she refused, so he pushed her over on the bed. Ibid. Defendant tested negative for gonorrhea shortly after his arrest. Id. at 565.

When defendant requested separate trials for the charges involving two different victims, the trial court denied the motion. Id. at 555. The court determined that evidence showing the defendant sexually assaulted K.W. "with his penis and finger" was admissible to prove defendant intended to touch S.E.'s "vagina for his sexual gratification" or to counter any possible claim that the touching was accidental or a mistake. Id. at 569. Ultimately, defendant was only convicted of the offenses involving S.E. Id. at 574.

We reversed Smith's convictions, holding that trying the "two sets of allegations together before a single jury clearly implied defendant had 'a

propensity to commit crimes,'" and was therefore more likely to commit the crimes for which he was on trial, which "clearly had the capacity to bring about an unjust result." Ibid. (quoting State v. Willis, 225 N.J. 85, 97 (2016)). We concluded the trial court had failed to explain "why the alleged touching of [S.E.]'s vagina was relevant to prove a material fact in dispute regarding [K.W.]'s allegations." Id. at 569. "More importantly," because defendant denied the assault of S.E. occurred at all, defendant's intent in touching her vagina was "never an issue" and the trial court's finding that K.W.'s evidence was relevant to prove intent or mistake was clearly erroneous. Id. at 569-70. Thus, the evidence relating to the assaults of K.W. "would not have been properly admitted at a separate trial of the crimes alleged by [S.E.] because they were not relevant to a material disputed fact under Cofield's first prong." Id. at 572.

Similarly, evidence of S.E.'s allegations would not have been admissible at a separate trial regarding the assaults of K.W. Ibid. We determined no "'clear and strong' logical connection between [S.E.]'s allegation that defendant repeatedly sexually touched her vaginal area before he went to work at 4 a.m., and [K.W.]'s explicit claims of sexual penetration during the same timeframe and sometimes in the same house." Ibid.

Defendant asserts here that <u>Smith</u> is dispositive because he too claimed that the sexual assault of J.Y. "did not occur at all." Further, the "interaction at Target was not for any sexual purpose" and therefore, "there was no clear and strong logical connection between the events."

Defendant's argument is without merit, as the facts of <u>Smith</u> are clearly distinguishable from the instant case. First, defendant never denied that J.Y. was sexually assaulted; rather, he contended that he was mistakenly identified as the perpetrator. Unlike the perpetrator in <u>Smith</u>, defendant's identity was a material issue in dispute. Further, regarding the Target incident, the central issue was defendant's state of mind. He admitted to approaching P.H. in Target, as shown in surveillance footage. Rather, defendant maintained that he did not do so with any malicious intent and denied threatening P.H.

Our review of the record confirms that that trial court conducted a thorough evaluation of the admissibility of such evidence, applying the familiar four-part test articulated in <u>Cofield</u>, 127 N.J. at 338, and made specific findings as to the probative value and relevance of the evidence.

Specifically, the trial court reasonably determined that evidence of defendant's conduct in each incident would have been admissible to prove material issues, including identity, motive, and intent, in a separate prosecution

of the other. Also, as the court reasonably concluded, the evidence that defendant sexually assaulted another child of the same age just thirteen days earlier was clearly relevant to establishing his motive and intent when he approached P.H. at Target and persuaded P.H. to follow him. There was no disagreement that the two incidents occurred close together in time. Additionally, as determined by both the court and the jury, the evidence showing that defendant committed the prior assault against J.Y. was more than the Cofield-required clear and convincing standard; it was sufficient to support the defendant's convictions beyond a reasonable doubt. Finally, the trial court did not abuse its discretion in finding that the probative value of this evidence outweighed any prejudice to the defendant.

However, lacking in the trial court's analysis was whether the evidence relating to the Target incident would have been admissible in a separate trial of defendant for the sexual assault of J.Y. As Smith emphasized, severance is not warranted if the "evidence would be admissible at both trials," because "'defendant will not suffer any more prejudice in a joint trial than he would in separate trials.'" 471 N.J. Super. at 567 (emphasis in original) (quoting Chenique-Puey, 145 N.J. at 341). The trial court here did not address whether the evidence of each offense would be admissible in both trials, only whether

the evidence of the first offense would be admissible at the trial for the second offense.

We therefore engage in our own plenary review to determine the admissibility of the evidence of the Target incident at defendant's trial for the sexual assault of J.Y. in the mall bathroom. Ibid. (quoting Rose, 206 N.J. at 158). Certainly, the video evidence relating to the Target incident was relevant to the material issue of defendant's identity as the perpetrator of the sexual assault of J.Y. Although the Nori Sushi video is not part of the appellate record, the trial testimony of both D.C. and J.M. indicate that defendant can be seen in the video taken in the mall food court on August 28, 2015. Defendant disputed that he was the person depicted in the Nori Sushi video. The similarities of defendant's physical appearance and gait in the Target videos, which were taken thirteen days later and which defendant conceded showed himself, lead to a conclusion that the evidence relating to both incidents would be admissible at a separate trial for the sexual assault of J.Y. Thus, the first prong of Cofield is satisfied.

The second and third Cofield prongs apply equally to the question of whether the Target evidence would be admissible in a prosecution for the sexual assault of J.Y. Both offenses were reasonably close in time. Notwithstanding

29

defendant's arguments to the contrary, the two offenses could be considered similar in kind, as the jury could find that both were committed for defendant's sexual gratification. Moreover, the evidence of defendant's offenses against P.H. was clear and convincing in light of the surveillance videos and the testimony of P.H., P.H.'s mother, and J.R. Regarding the fourth Cofield prong, any prejudice to defendant was outweighed by the probative value of the evidence. We are thus satisfied the trial court did not err in denying defendant's severance motion.

Limiting Instruction

Defendant argues for the first time on appeal that the trial court should have given a limiting instruction about evidence of other crimes. Although no such specific instruction was given, the court did tell the jury to consider each charge separately and to base their verdict only on evidence relevant to each count as follows:

> Now, we do have, as you know, multiple charges. There are nine criminal offenses charged in the indictment. They are separate offenses by separate counts in the indictment. In your determination of whether the State has proven the [d]efendant guilty of the crimes charged in the indictment beyond a reasonable doubt the [d]efendant is entitled to have each count considered separately by the evidence which is relevant an[d] material to that particular charge based on the law as I will give it to you.

Defendant did not ask for a more detailed instruction, nor object to the instructions that were given during the charge conference or following the jury charge. Given these circumstances, our review is for plain error, and, in accordance with well-established legal precedent, we find no such error. State v. Singleton, 211 N.J. 157, 182 (2012); see also R. 1:7-2 ("no party may urge as error any portion of the charge to the jury or omissions therefrom unless objections are made thereto before the jury retires to consider its verdict . . . ."). Plain error in the context of a jury charge "requires demonstration of legal impropriety in the charge prejudicially affecting the substantial rights of the defendant and sufficiently grievous to justify notice by the reviewing court and to convince the court that of itself the error possessed a clear capacity to bring about an unjust result." Singleton, 211 N.J. at 182-83 (internal quotation marks omitted) (quoting State v. Chapland, 187 N.J. 275, 289 (2006)).

Generally, once the trial court has determined that other crimes evidence is admissible,

> the jury must be instructed on the limited use of the proofs actually presented. In the context of criminal trials, our Supreme Court has explained that because "the inherently prejudicial nature of such evidence casts doubt on a jury's ability to follow even the most precise limiting instruction," . . . the instructions should be formulated carefully to enable the jury to comprehend the fine distinction to which it is required to adhere.

31

> [State v. Krivacska, 341 N.J. Super. 1, 41-42 (App. Div. 2001) (quoting State v. Stevens, 115 N.J. 289, 309 (1989)).]

In Krivacska, which involved the defendant's prosecution for sexual assault of two separate victims, we found a jury instruction—similar to the one given in the present case—insufficient, as it "did not specifically tell the jury that it could not consider the other-crime evidence to determine that the defendant was predisposed to commit the crimes charged." Id. at 42. "Nor did the instructions narrowly focus the jury's attention on the specific use of the other-crime evidence." Ibid. Nonetheless, we held that this did not rise to the level of plain error, noting that the charge actually given "clearly conveyed the principle that the jury was prohibited from considering the cumulative impact of the evidence of all the offenses in determining whether a particular charge had been proven," which was "the thrust of the instruction to consider each charge separately." Id. at 43. Moreover, we found, the "jury faithfully complied with that instruction, acquitting the defendant of one of the charges" and thus, "discern[ed] little or no danger that the jury considered the other-crime evidence to find a general propensity on the part of defendant to commit sexual assaults." Ibid.

Similarly, in this context, we note that the jury acquitted defendant of third-degree terroristic threats, third-degree possession of a weapon for an unlawful purpose, and fourth-degree unlawful possession of a weapon relating to the Target incident. This verdict demonstrates the jurors carefully evaluated the evidence and considered each charge separately, as they were properly instructed to do. We thus discern no error in the jury instruction.

Motion for Directed Verdict of Acquittal

In his second point, defendant contends the trial court erred in failing to grant his motion for a judgment of acquittal regarding his convictions for second-degree attempted kidnapping, second-degree luring, second-degree attempted sexual assault and third-degree endangering the welfare of a child, all of which arose out of the Target incident. Defendant contends these convictions must be vacated because the State presented insufficient proof of each of those offenses. We disagree.

"Rule 3:18-1 provides that a court must enter a judgment of acquittal after the close of the State's case or after the close of the defendant's case if 'the evidence is insufficient to warrant a conviction.'" State v. Lodzinski, 249 N.J. 116, 143 (2021). "Rule 3:18-2 is an additional safeguard, authorizing a court to enter a judgment of acquittal even after the return of a verdict of guilty, when

the evidence does not rationally support a conviction." Ibid. "The power to enter a judgment of acquittal cannot be invoked because a judge has a mere difference of opinion with the outcome of a trial; it can be invoked only to prevent a miscarriage of justice." Id. at 143-44.

A reviewing court applies "the same standard as the trial court to decide if the trial judge should have granted a judgment of acquittal." State v. Sugar, 240 N.J. Super. 148, 153 (App. Div. 1990). "That standard is the same whether the motion is made at the close of the State's case, at the end of the entire case, or after a jury returns a guilty verdict under Rule 3:18-2." State v. Fuqua, 234 N.J. 583, 590 (2018). A motion for a judgment of acquittal will not be granted if:

> the evidence, viewed in its entirety, be it direct or circumstantial, and giving the State the benefit of all of its favorable testimony as well as all of the favorable inferences which reasonably could be drawn therefrom, is sufficient to enable a jury to find that the State's charge has been established beyond a reasonable doubt.
>
> [Id. at 590-91 (quoting State v. Kluber, 130 N.J. Super. 336, 341-42 (App. Div. 1974)).]

"On such a motion the trial judge is not concerned with the worth, nature or extent (beyond a scintilla) of the evidence, but only with its existence, viewed most favorably to the State." Kluber, 130 N.J. Super. at 342. "[A] jury may

draw an inference from a fact whenever it is more probable than not that the inference is true; the veracity of each inference need not be established beyond a reasonable doubt in order for the jury to draw the inference." State v. Brown, 80 N.J. 587, 592 (1979); see Reyes, 50 N.J. at 458-59 (applying that standard after the close of the State's case under Rule 3:18-1).

In denying defendant's motion for a judgment of acquittal with respect to the Target offenses, the trial court found that "in reviewing the evidence and giving the State all of the benefits of favorable testimony and favorable inferences," a "reasonable jury could find that the State has established attempted kidnapping beyond a reasonable doubt." This evidence included the videos of what occurred in Target that were narrated by J.R., which showed "defendant heading toward the exit with [P.H.] in tow" until he was "sort of interrupted by" J.R. and he "hurriedly" went out to his car. The court noted J.R.'s testimony that "defendant really took off after [J.R.] made eye contact with him" finding that that the jury could "infer that that was flight" and "consciousness of guilt." Also significant was the testimony of P.H.'s mother that his parents did not give consent, and the fact that a car seat was found in defendant's car. Having reviewed video footage of the Target incident, we

concur with this assessment by the trial court.  See Sugar, 240 N.J. Super. at 153.

The court reached the same conclusion with respect to the luring and attempted sexual assault charges.  As the court noted, there was no dispute about P.H.'s young age.  The "most favorable view of the State's testimony is that the defendant tried to sort of entice or induce or coax in a friendly way by talking about finding toys and then in a threatening way by threatening to cut up [P.H.] if he didn't follow, cut him up into pieces."  For the attempted sexual assault, the court found that, in conjunction with this other evidence, "the motive evidence from the mall" could allow a reasonable jury to "find all of the elements of attempted sexual assault."  With respect to proofs on the endangering charge, when the evidence is viewed in the light most favorable to the State, we concur with the trial court that the testimony from P.H.'s mother regarding the threat made by defendant, her description of the incident's effect on P.H., and J.R.'s testimony describing P.H.'s appearance when J.R. first saw him, all support a finding of harm.  See ibid.

Defendant further argues that his motion for a judgment of acquittal should have been granted because "no proofs were presented that the attempted

Target kidnapping or the related offenses of luring, and attempted sexual assault were for a sexual purpose."  Again, we disagree.

To convict defendant of attempted kidnapping as charged under the indictment here, the State had to prove that defendant attempted to "unlawfully remove[] another from his place of residence or business, or a substantial distance from the vicinity where he is found, or . . . unlawfully confine[] another for a substantial period," with the purpose to "facilitate commission of any crime or flight thereafter . . . ."  N.J.S.A. 2C:13-1(b)(1).  To prove attempt, the State was required to demonstrate that defendant,

> acting with the kind of culpability otherwise required for the commission of the crime . . . [p]urposely d[id] or omit[ted] to do anything which, under the circumstances as a reasonable person would believe them to be, is an act or omission constituting a substantial step in a course of conduct planned to culminate in his commission of the crime.
>
> [N.J.S.A. 2C:5-1(a)(3).]

To prove an attempted sexual assault under N.J.S.A. 2C:14-2(b), the State was required to establish defendant had purposely undertaken a "substantial step in a course of conduct planned to culminate in his commission" of "an act of sexual contact with a victim who is less than 13 years old and" defendant "is at

least four years older than the victim." N.J.S.A. 2C:14-2(b); N.J.S.A. 2C:5-1(a)(3).

The pertinent elements of luring are that defendant "attempt[ed] . . . to lure or entice a child . . . into a motor vehicle, structure or isolated area, . . . with a purpose to commit a criminal offense with or against the child." N.J.S.A. 2C:13-6(a). The relevant elements of third degree endangering the welfare of a child under N.J.S.A. 2C:24-4(a)(2) are that defendant "engage[d] in conduct" or "cause[d] harm" to a child "that would make the child an abused or neglected child" under N.J.S.A. 9:6-1, N.J.S.A. 9:6-3, and N.J.S.A. 9:6-8.21.

Defendant relies on State v. Perez, 349 N.J. Super. 145 (App. Div. 2002), which involved convictions for luring and attempted child endangerment, in which the Appellate Division found the evidence presented did not support defendant's convictions. However, in his brief defendant does not acknowledge that the Supreme Court reversed the Appellate Division's decision in Perez and reinstated defendant's convictions for luring and attempted child endangerment. See State v. Perez, 177 N.J. 540, 544 (2003). The Supreme Court's holding in Perez instead supports the trial court's denial of defendant's motion for a judgment of acquittal.

In Perez, the thirty-four-year-old defendant encountered the victim, a thirteen-year-old girl, on two separate occasions. Ibid. On the first occasion, defendant was driving his car and observed the victim walking alone to school in the rain and offered her a ride twice, which she declined twice, and defendant drove away. Ibid. On the second occasion, defendant was driving and called out to the victim, who was riding her bike with her brothers, asking her, "do you remember me?" and beckoning her to the car, which the victim rebuffed. Id. at 544-45. When later asked by police about his interactions with the victim, defendant admitted that he approached the victim because she was "cute" and he thought she was "about 16"; he described himself as being "obsessed with her, but not like anything out of the ordinary." Id. at 545. He was "trying to take advantage of" how he looked "now while I can." Ibid.

The Court reinstated defendant's convictions for luring and attempted child endangerment, finding that the facts presented at trial permitted a reasonable jury to find all of the elements of each offense. Id. at 551-52. With respect to luring, the court noted that "the harm sought to be proscribed is the act of endeavoring, or trying, to get a child into one's car, and not the act of successfully getting the child into the car. A defendant's simple attempt to lure or entice a child into the prohibited space is the only act required under the

statute." Id. at 550 (emphasis in original). That attempt was clear from the evidence. Further, the Court found that defendant's own statements were sufficient to find that he had "acted with a purpose to commit a criminal offense with or against" the victim. Id. at 552. "The jury was entitled to apply its common sense and experience in evaluating the meaning of defendant's statements. In so doing, it could draw reasonable inferences to conclude that defendant's purpose in attempting to lure [the victim] into his car was to engage in sexual conduct." Id. at 553.

Similarly, here, every indication is that the jury used its common sense to find that defendant's actions in enticing P.H. to follow him in Target, which was clearly demonstrated on video, was for the purpose of removing him from Target in order to commit the criminal offense of sexual contact. This is particularly true assuming the jury believed both the testimony of P.H.'s mother, who recounted defendant's threats to five-year-old P.H. to cut him up into pieces, and that, only a few days before, defendant had sexually assaulted J.Y. in the mall bathroom. Assuming the jury found this evidence reliable, its inference of defendant's criminal purpose was reasonable and was not too remote, tenuous and speculative, as defendant contends.

40

For these reasons, we perceive no error in the trial court's denial of defendant's motion for a judgment of acquittal.

Defendant's Statement

In Point III, defendant argues that the court erred by admitting statements he made to police after invoking his "desire to remain silent" and his right to counsel. At trial, defendant opposed the State's motion to admit these statements, asserting that they should be suppressed under the doctrine of fundamental fairness. See generally State v. Shaw, 241 N.J. 233, 239 (2020). His objection was based on Sergeant Wang's attempt to establish a rapport with him and because he repeatedly invoked his right to counsel, which, according to defendant, should have required the interrogation to cease.

At the Miranda hearing, Sergeant Wang testified regarding the circumstances of defendant's interrogation. He recounted details of defendant's arrest, establishing beyond dispute that defendant was in custody and advised the charges against him included sexual assault, clarifying during the subsequent hearing that a summons and complaint had not yet been drafted.

The detective recounted that after defendant was handcuffed, a search of his person revealed a folding knife. Defendant said, "that's my knife. I have it on me all the time." A Rockaway Township police officer transported defendant

to police headquarters in a patrol car. Once there, police brought defendant to the interview room, and the audio and video recording was activated. The video was played during the hearing.

Video of the interrogation shows Sergeant Wang informing defendant of his <u>Miranda</u> rights and reviewing the rights form with him. Defendant agreed to speak with police. Defendant repeatedly denied any wrongdoing, conceding that he had been in Target the night before and encountered a child, but claimed he was just trying to be helpful. Defendant denied sexually assaulting J.Y. in the mall bathroom, stating "I didn't do anything. No idea what you're talking about."

After defendant denied threatening the child in Target, the following colloquy occurred:[5]

---

[5] The quoted passage is taken from the amended transcript of the suppression hearing provided to the court at its request after the briefs were filed. The initial suppression hearing transcript did not transcribe the video of defendant's interrogation played in court, and the parties rely in their briefs on the unofficial transcript of the interrogation prepared by personnel from the Morris County Prosecutor's Office. Although there are minor discrepancies between these transcripts as well as the trial transcript of the portions of the interrogation video played for the jury, the parties agreed that the official transcripts control, except they stipulated to correct one passage in which the trial transcript was erroneous. In any event, the discrepancies do not materially affect our analysis. In future appeals, counsel should provide to the court and cite in their briefs only the official transcripts of the proceedings below. <u>See</u> <u>Rule</u> 2:5-3 and Judge Sabatino's concurrence.

[DEFENDANT:] Listen, if this is gonna go further I just wanna see a lawyer because I -- I give you my word as a man, okay, that I would never do something like that.

[WANG:] Okay. That's your, that's your right, so, you know, we --.

[DEFENDANT:] And that's my phone number, I'll let you take a photocopy of my I.D., and I'll go speak with anybody about this, and I'll tell them it would never happened. I would never do something like that.

[WANG:] Okay. Well, you had mentioned a lawyer, so I don't know if you want to continue to hear what we have to say, but you keep talking, so I don't know.

[DEFENDANT:] No, no. You can say whatever you want.

[WANG:] No, I'm just saying you -- you had mentioned lawyer. So I don't know if you want to continue talking with us and hear what we have to say

[DEFENDANT:] No. Wh-, what do –

[WANG:] -- or do you want to stop.

[DEFENDANT:] What do you have to say?

[WANG:] That you would like us to continue.

[DEFENDANT:] If you'd like.

[WANG:] Okay.

43

A-0316-22

[TAKACS]:  Listen, listen, listen.  Seriously, would you like us to?  That's the question, because you mentioned a lawyer.

[DEFENDANT:]  No I mean like, I'm hungry.  I want a cigarette and stuff.  But I mean I – I didn't say that to that kid and  I swear.

[WANG:]  Okay.  Well, alright.  Do – okay.  Do you want to -- I'm confused cause you – you mentioned the word "lawyer", so we hear stop, but then you --
.

[DEFENDANT:]  No, I mean if –

[WANG:]  -- keep talking.

[DEFENDANT:]  -- if you have, if you have any other accusations or veiled accusations to accuse me of, you -- you may do so.  However, I would never threaten a five-year-old child verbally – verbally -- with a knife.


[WANG:]  Okay, okay.  So would you like to continue speaking with us?

[DEFENDANT:]  I mean, if its gonna clear my name, yeah, then I would.

[WANG:] That's up to you. Yes or no?

[DEFENDANT:]  Do you, do you have anything else to say?

[WANG:]  Yes.  We do, yes.

A-0316-22

[DEFENDANT:] Okay. Then please do.[6]

The detectives offered defendant a bathroom break and water but defendant declined. Wang asked again, "And you're good with us talking?" to which defendant replied, "Yeah." The detectives then questioned defendant about the incident at Rockaway Mall. Defendant continued to deny any wrongdoing.

In granting the State's motion to admit defendant's statements at trial, the trial court found Wang's testimony to be credible and "corroborated by the transcripts and recordings." The court found that defendant "was in custody and under interrogation at the time the statements were made[,]" that he was properly Mirandized and that "he waived his rights and agreed to speak with law enforcement."

With respect to defendant's argument that he had invoked his right to counsel, the court found his request "ambiguous" and held that, even if the request were clear, defendant "initiated further conversation with law enforcement and law enforcement attempted to clarify [d]efendant's statement." Defendant stated he wished to keep talking until such time as Wang asked if

---

[6] Defendant's references to a lawyer were redacted from the video of his interrogation played for the jury at trial.

A-0316-22

defendant wanted to continue and defendant responded, "after I speak with my lawyer." This was a "clear invocation of the right to counsel" and police "did not ask any specific fact questions about the case after this exchange."

The court further found that "there is no evidence of any overreaching by police that might render the statement involuntary." Defendant was thirty-four years old and had at least one prior encounter with law enforcement. There was "no indication" that defendant was "under the influence" or confused; rather, defendant appeared lucid, comfortable and attentive throughout the interview. There was no "yelling, screaming or undue pressure exerted on defendant." The court therefore found "no evidence that [d]efendant's will was overborne" and held "beyond a reasonable doubt that [d]efendant's statement was provided voluntarily." Finally, the court found no merit in defendant's arguments regarding fundamental fairness or the detectives' rapport with defendant.

On appeal, defendant argues, as he did at the trial level, that detectives were required to cease questioning after the first instance of defendant's invocation of his right to counsel, and that admission of any statements he made after that was error. Defendant also argues for the first time on appeal that by repeating "[t]hat's it" to detectives when they asked him about his side of the

story, he invoked his right to silence, and police should have clarified his intentions before questioning could resume. We disagree.

A statement made during a custodial interrogation will be deemed admissible "if it results from the 'voluntar[y], knowing[] and intelligent[]' waiver of [the] constitutional right to remain silent." State v. Knight, 183 N.J. 449, 461 (2005) (quoting Miranda, 384 U.S. at 444). Before obtaining such a waiver, "the suspect must be advised: (1) 'that he has the right to remain silent'; (2) 'that anything he says can be used against him in a court of law'; (3) 'that he has the right to the presence of an attorney'; . . . (4) 'that if he cannot afford an attorney, one will be appointed for him prior to any questioning if he so desires'; and (5) that the suspect 'can exercise his rights at any time during the interrogation.'" State v. Tillery, 238 N.J. 293, 315 (2019) (quoting Miranda, 384 U.S. at 479). The State bears the burden of proving beyond a reasonable doubt that defendant's will was not overborne and his statements were voluntary. State v. Cook, 179 N.J. 533, 562 (2004) (citing State v. Galloway, 133 N.J. 631, 654 (1993)).

In determining whether a defendant has made a valid waiver and provided a voluntary statement, the "court must look at the totality of the circumstances, including the characteristics of the defendant and the circumstances of the

A-0316-22

interrogation." State v. Timmendequas, 161 N.J. 515, 613-14 (1999) (citing State v. Cooper, 151 N.J. 326, 356 (1997); Galloway, 133 N.J. at 654). Factors that inform the analysis include: the suspect's age, education, intelligence, previous encounters with law enforcement, and advice about constitutional rights; and the length of detention, the period of time between the warnings and confession, and whether the questioning was prolonged or involved physical or mental abuse. Id. at 614 (citations omitted).

Appellate courts review the factual findings by a trial court regarding a defendant's Miranda waiver "in accordance with a deferential standard. We consider whether those findings are 'supported by sufficient credible evidence in the record.'" Tillery, 238 N.J. at 314 (quoting State v. S.S., 229 N.J. 360, 374 (2017)). "[A] trial court's findings should be disturbed only if they are so clearly mistaken 'that the interests of justice demand intervention and correction.'" Ibid. (citing State v. A.M., 237 N.J. 384, 395 (2019)). Appellate courts review de novo any legal conclusions reached by the trial court in admitting a defendant's statements under Miranda. Ibid. However, because defendant did not argue below that his Miranda waiver was invalid because he invoked his right to silence, we review that issue "for plain error." State v. Sims, 250 N.J. 189, 210 (2022); see also R. 2:10-2 ("Any error or omission shall be disregarded by the

appellate court unless it is of such a nature as to have been clearly capable of producing an unjust result.").

"Once an accused invokes the right to counsel, that right must be 'scrupulously honored.'" State v. Chew, 150 N.J. 30, 61 (1997) (quoting Michigan v. Mosley, 423 U.S. 96, 103 (1975)).  The same is true if the suspect invokes his right to remain silent.  State v. Bey, 112 N.J. 123, 136 (1988) (Bey II) (quoting Mosley, 423 U.S. at 104) ("[T]he admissibility of statements obtained after the person in custody has decided to remain silent depends . . . on whether his 'right to cut off questioning' was 'scrupulously honored.'").  Thus, once a suspect makes a clear invocation of his right to remain silent, or his right to counsel, the "interrogation must cease."  Ibid. (quoting Miranda, 384 U.S. at 473-74); see also Chew, 150 N.J. at 61 (quoting Edwards v. Arizona, 451 U.S. 477, 484-85 (1981) ("'Scrupulously honor[ing]' the invocation of the right to counsel entails terminating all questioning 'until counsel has been made available [or] unless the accused . . . initiates further communication, exchanges, or conversations with the police.'")).  However, if the defendant "does initiate a conversation after invoking his rights, that conversation may be admissible if the initiation constitutes a knowing, intelligent, and voluntary waiver of the accused's rights."  Chew, 150 N.J. at 61 (citing Miranda, 384 U.S. at 444).  It

A-0316-22

remains the State's "heavy burden" to demonstrate "that the waiver was knowing, intelligent, and voluntary." Ibid. (citing State v. Hartley, 103 N.J. 252, 260 (1986)).

"[A]n equivocal indication of a desire to remain silent, like an unequivocal indication, suffices to invoke Miranda's requirement that the interrogation cease." State v. Johnson, 120 N.J. 263, 281 (1990) (quoting Christopher v. Florida, 824 F.2d 836, 840 (11th Cir. 1987)). Similarly, with respect to the right to counsel, our Supreme Court has held as a "general rule . . . that 'a suspect need not be articulate, clear, or explicit in requesting counsel; any indication of a desire for counsel, however ambiguous, will trigger entitlement to counsel.'" State v. Alston, 204 N.J. 614, 622 (2011) (quoting State v. Reed, 133 N.J. 237, 253 (1993)). In either event, "[w]hen a suspect's words are ambiguous," police are permitted "to follow up by asking questions that are designed to clarify the meaning of those words." Ibid.

> Any words or conduct that reasonably appear to be inconsistent with defendant's willingness to discuss his case with the police are tantamount to an invocation of the privilege against self-incrimination. Law enforcement officials, however, are not obliged to accept any words or conduct, no matter how ambiguous, as a conclusive indication that a suspect desires to terminate questioning.
>
> [Bey II, 112 N.J. at 136-37.]

"Whether a suspect has invoked his right to remain silent requires analysis of the totality of the circumstances, including consideration of the suspect's words and conduct."  State v. Maltese, 222 N.J. 525, 545 (2015) (citing State v. Diaz-Bridges, 208 N.J. 544, 568-69 (2012)).  "Because the right to counsel is so fundamental, an equivocal request for an attorney is to be interpreted in a light most favorable to the defendant."  State v. Gonzalez, 249 N.J. 612, 632 (2022) (quoting Chew, 150 N.J. at 63).

Defendant argues that, by saying "[t]hat's it" in response to Takacs' invitation to tell the detectives defendant's side of the story, defendant invoked his right to silence and questioning should have ceased, or police should only have asked about whether defendant was willing to continue speaking with them. Defendant analogizes this to a suspect who told police he "would have nothing to say" which was "clearly sufficient to trigger the relevant constitutional protections afforded a criminal suspect undergoing custodial interrogation." State v. Bey, 112 N.J. 45, 64 (1988) (Bey I).

"Words used by a suspect are not to be viewed in a vacuum, but rather in 'the full context in which they were spoken.'"  S.S., 229 N.J. at 382 (citation omitted).  "In that light, '[a]ny words or conduct that reasonably appear to be inconsistent with defendant's willingness to discuss his case with the police are

tantamount to an invocation of the privilege against self-incrimination.'" Ibid. (quoting Bey II, 112 N.J. at 136).

In viewing the full context of defendant's statements, defendant's words were consistent with his willingness to keep speaking to police. By saying "[t]hat's it" defendant appears to have been merely describing his actions as minimal and noncriminal, not indicating an unwillingness to keep speaking. Indeed, defendant kept talking with the detectives for a significant amount of time after he said "[t]hat's it" giving no further indication that he wished to exercise his right to remain silent. In fact, our review of the interrogation transcript reflects nineteen occasions where defendant uttered the phrase "That's it." Read in context, it is clear that this was defendant's means of minimizing the criminal nature of his conduct, and did not constitute a means of indicating he did not wish to speak further.

With respect to defendant's request for an attorney, we agree with the trial court finding that the record demonstrates it was defendant who initiated further conversation after first stating, "[I]f this is gonna go further I just want to see a lawyer." Detectives attempted to clarify on several occasions whether defendant wished to invoke his right to counsel and defendant told them repeatedly in

response to those clarification questions that he would like to continue speaking with police.

The trial court made detailed and well-supported findings that defendant waived his <u>Miranda</u> rights knowingly, intelligently, and voluntarily. The record supports the trial court's conclusion that defendant's cursory reference to counsel was ambiguous; officers scrupulously honored his rights by clarifying his intentions and ceasing questioning upon his unequivocal request. <u>See</u> <u>Chew</u>, 150 N.J. at 61; <u>Alston</u>, 204 N.J. at 622. Therefore, in view of the totality of circumstances, we concur with the trial court's ruling that the State sustained its burden to demonstrate that defendant's initiation of further conversation constituted a knowing, intelligent and voluntary waiver of his right to counsel, rendering his statements admissible. <u>Chew</u>, 150 N.J. at 61. We therefore discern no error in the admission of defendant's statement to police.

Identification Testimony

In his fourth point on appeal, defendant argues that the trial court erred in allowing lay opinion testimony from Detectives Takacs and Wang regarding what they saw on certain of the videos that were shown to the jury. In particular, defendant objects to Takacs' testimony that, in comparing the Nori Sushi and

Target videos, the photographs taken by D.C. and defendant's driver's license photograph, he believed them to be the same person.

This court defers to the evidentiary rulings of the trial court absent an abuse of discretion. State v. Garcia, 245 N.J. 412, 430 (2021) (quoting State v. Medina, 242 N.J. 397, 412 (2020) (noting that an appellate court "will not substitute [its] judgment unless the evidentiary ruling is 'so wide of the mark' that it constitutes 'a clear error in judgment'")).

Under N.J.R.E. 701,

> If a witness is not testifying as an expert, the witness'[s] testimony in the form of opinions or inferences may be admitted if it:
>
> > (a) is rationally based on the witness'[s] perception and
> >
> > (b) will assist in understanding the witness'[s] testimony or determining a fact in issue.

Our Supreme Court has affirmed the ability of police officers to offer lay opinions based on "the officer's personal perception and observation." State v. McLean, 205 N.J. 438, 459 (2011); see also State v. LaBrutto, 114 N.J. 187, 198 (1989) ("Courts in New Jersey have permitted police officers to testify as lay witnesses, based on their personal observations and their long experience in areas where expert testimony might otherwise be deemed necessary.").

However, N.J.R.E. 701 "does not permit a witness to offer a lay opinion on a matter 'not within [the witness's] direct ken . . . and as to which the jury is as competent as he to form a conclusion[.]'" McLean, 205 N.J. at 459 (alteration in original) (quoting Brindley v. Firemen's Ins. Co., 35 N.J. Super. 1, 8 (App. Div. 1955)).

Both defendant and the State rely on State v. Singh, 245 N.J. 1, 4 (2021), which addressed a detective's narration of surveillance video of a robbery. In Singh, the detective referred to the man seen on the video as defendant and pointed out the similarities between the sneakers worn by the man in the video and the sneakers defendant was wearing when he was arrested. Id. at 8-9. The Court found that, although it was error for the detective to refer to the man on the video as defendant, "that error was harmless given the fleeting nature of the comment and the fact that the detective referenced defendant as 'the suspect' for the majority of his testimony." Id. at 17.

However, the Court held that it was "proper lay opinion testimony under N.J.R.E. 701" for the detective to testify about the similarity of the sneakers because the detective: (1) saw defendant wearing them on the night of his arrest; and (2) had first-hand knowledge of what the sneakers looked like; thus, "his testimony was helpful to the jury." Id. at 18-20. The Court noted that just

55

because the jury could have compared the sneakers themselves did not mean that the detective's testimony otherwise was unhelpful, or that his "testimony usurped the jury's role in comparing the sneakers." Id. at 20. Rather, the Court stated, the jury was free to discredit the detective's conclusions. Ibid. Because the detective did not testify that the sneakers were the same, just that they were "similar," he did not reach the "ultimate determination." Ibid.

In State v. Sanchez, 247 N.J. 450, 458-59 (2021), the Court found that it was not error for a law enforcement officer to identify defendant as the individual depicted in a still photograph "derived from surveillance video taken shortly after" a homicide and robbery when the officer had "extensive contacts with defendant . . . ." There, the identifying officer was defendant's parole officer. The Court found that the officer's lay opinion testimony satisfied the first prong of N.J.R.E. 701, as it was "based on knowledge personally acquired through the witness's own senses, rather than on the hearsay statements of others" and the officer was familiar with defendant after "meeting with him on more than thirty occasions during his period of parole supervision." Id. at 469.

The testimony also satisfied the second prong of N.J.R.E. 701. Ibid. The Court identified four non-exclusive factors to be considered in this determination: (1) "the nature, duration, and timing of the witness's contacts

with the defendant"; (2) "if there has been a change in the defendant's appearance since the offense at issue, law enforcement lay opinion identifying the defendant may be deemed helpful to the jury"; (3) "whether there are additional witnesses available to identify the defendant at trial"; and (4) "the quality of the photograph or video recording at issue." Id. at 470-73. If it "is so clear that the jury is as capable as any witness of determining whether the defendant appears in it," or if it is "of such low quality that no witness -- even a person very familiar with the defendant -- could identify the individual who appears in it, lay opinion testimony will not assist the jury." Id. at 473.

The Sanchez Court found that all of the factors except the second, which was not applicable as there was no indication whether defendant had changed his appearance, favored the admission of the officer's testimony. Id. at 474-75. As the Court held, the officer's "contacts with defendant were more than sufficient to enable her to identify him in the surveillance photograph more accurately than a jury could." Id. at 474. There were no other eyewitnesses who could identify defendant as the perpetrator. Ibid. Finally, the surveillance photograph was "neither so blurry that the subject's features are indistinguishable, nor so clear that jurors unacquainted with defendant could determine as accurately as" the officer whether it depicted defendant. Id. at 475.

57

More recently, in State v. Watson, 254 N.J. 558, 603 (2023), the Court offered guidance on the admissibility of narration testimony relating to video evidence by individuals without firsthand knowledge of the events depicted, holding that while investigators can describe what appears on the video, they "may not offer opinions about the content." Moreover, while they can offer admissible opinion testimony, they may not "offer their views on factual issues that are reasonably disputed" and "should not comment on what is depicted in a video based on inferences or deductions, including any drawn from other evidence." Id. at 603-04. For example, an investigator may not say, "'that's the same blue car' or 'that's the defendant,' if those facts were disputed." Id. at 604.

Mindful of the limits set forth in Singh and Watson, we determine that the trial court did not abuse its discretion in admitting Sergeant Wang's testimony about consistencies in defendant's gait both in person and on the Nori Sushi video under N.J.R.E. 701. See Garcia, 245 N.J. at 430. Wang had firsthand knowledge of defendant's gait and properly shared that knowledge with the jury.

The admission of Takacs' testimony that the man in the Nori Sushi video, the Target videos, D.C.'s photos, and defendant's driver' license photo "all appeared to be the same person" presents a closer question. At trial, Detective Takacs testimony compared the men in the photos and video to defendant's

driver's license photo and determined they were the same person.  Although the State observes that Takacs never outright identified defendant, the import of his testimony was tantamount to a positive identification.  We therefore scrutinize Takacs' testimony under the factors set forth in Sanchez.

As defendant himself conceded that he was shown on the Target videos as the man who approached P.H., the only video evidence truly at issue on appeal is the Nori Sushi video taken at the mall.  Takacs testified as to his prior contacts with defendant, having seen him once every two weeks for the previous year to eighteen months.  But this is only one factor of four non-exclusive factors outlined in Sanchez. 247 N.J. at 470.  The appellate record contains no information about whether defendant changed his appearance or the quality of the Nori Sushi video, as the video has not been provided to this court.  Further, other witnesses, namely J.Y. and D.C., identified defendant as either the perpetrator or the man in the Nori Sushi video.  Thus, the remaining Sanchez factors do not weigh in support of Takacs being permitted to identify defendant as the man in the video.  Id. at 470-73.

Having assessed the pertinent factors, we agree with defendant that the trial court erred in permitting an officer to opine that the individual depicted in the surveillance video was defendant, as this invaded the province of the jury.

A-0316-22

Singh, 245 N.J. at 1. However, given the number of other witnesses who identified defendant, and the other evidence against him, allowing Detective Takacs to do so was ultimately harmless error. See State v. Derry, 250 N.J. 611, 636 (2022) (error in admitting improper lay opinion testimony was harmless in light of "the overwhelming evidence against defendants"). See also State v. Allen, 254 N.J. 530, 549-52 (2023). Here, J.Y. specifically identified defendant as the man who sexually assaulted him, and J.M. specifically identified defendant as the man she saw rush out of the bathroom immediately afterward. Further, defendant made no objection at trial and makes no objection on appeal to D.C.'s identification of defendant as the man in the Nori Sushi video. In light of these other identifications, we determine that Detective Takacs' identification of defendant, even if improper, was harmless beyond a reasonable doubt and did not affect the outcome of the trial.

On the subject of identification testimony, we are satisfied the trial court did not err in finding J.M.'s identification of defendant was confirmatory. That is because "when a witness identifies someone he or she knows from before but cannot identify by name[,]" such an identification "is not considered suggestive." State v. Pressley, 232 N.J. 587, 592-93 (2018). The trial court correctly found that J.M.'s ability to identify defendant—based on seeing him at

the mall about twice a week for a year—met the Supreme Court's determination that identifications stemming from such familiarity, by definition, are not suggestive.

<u>Admission of Uncharged Evidence</u>

In Point V, defendant claims that the trial court erred in admitting into evidence the knife, machete, suitcase, and toy found in defendant's apartment, as well as a car seat found in his car. Defendant asserts the probative value of such evidence was outweighed by the prejudice to defendant.

Once more, this court defers to the evidentiary rulings of the trial court absent an abuse of discretion. <u>Garcia</u>, 245 N.J. at 430. If testimony or evidence challenged on appeal was not objected to below, this court applies the "plain error" standard. <u>Singh</u>, 245 N.J. at 13; <u>see also</u> <u>R.</u> 2:10-2.

At trial, Sergeant Wang testified that following his arrest, a "convertible type[]" child's car seat was found during the search of defendant's car. Wang further testified that a knife and machete, as well as several black shoes, were found during the search of defendant's residence. Defendant did not object to Wang's testimony.

Detective Sergeant Douglas Meyer from the Morris County Sheriff's Office later testified regarding the search of defendant's residence pursuant to a

search warrant, and discussed photographs he took of the items found. Meyer testified that a photograph showed a machete found "next to the bed" in defendant's residence, and defendant objected. Defense counsel argued that the machete was not relevant as it was "not charged in the indictment" and was unduly prejudicial. The State asserted that the machete was relevant to defendant's intent with respect to the Target incident, as he had threatened to cut P.H.

The court overruled defendant's objection, finding that the machete was "relevant and admissible" with respect to the alleged purpose of "the kidnapping which was to sexually assault" as a machete would "potentially be useful" in that case. Importantly, the court issued a limiting charge:

> the weapons charges in the indictment in this case do not involve that machete. The charged weapon is the charging knife. . . . [T]here is nothing illegal or unlawful about possessing a machete. A machete can be used, you know, for example, for yard work or anything . . . . There's nothing illegal about possessing that. But you -- but you may consider it as evidence relating to the charges.

Meyer also testified about the toy, suitcase, and car seat without objection. He then testified about a "folding knife" also found in defendant's residence, to which defense counsel made the same objection. The trial court made the same ruling, overruling the objection.

During deliberations, the jury requested to see the machete and the knife found in defendant's residence. Both items were shown to the jury, with court making clear that the knife was not the knife referred to in counts eight and nine of the indictment.

After conviction, defendant raised admission of the machete as an issue in his motion for a new trial. The court rejected the argument, finding that the machete was relevant to the charges against defendant for attempted kidnapping, sexual assault and luring, as it was "available . . . to defendant to maintain control over, and to facilitate sexual assault of his victim had defendant been successful in taking his victim, P.H., out of the Target Store and into his vehicle." Further, the court noted the jury was instructed that there was "nothing . . . in and of itself illegal or unlawful about possessing a machete," which would "ensure that there was no undue prejudice from its admission."

After consideration of the record, we perceive no plain error. Even on appeal, defendant makes no argument as to how the probative value of such evidence was "substantially outweighed by the risk of . . . [u]ndue prejudice, confusion of issues, or misleading the jury . . . ." N.J.R.E. 403(a). Any risk of undue prejudice was sufficiently tempered by the trial court's limiting charge. The same holds true for admission of the knife and the machete found in

defendant's residence. We echo the trial court's conclusion that those items were relevant to the charges against defendant arising out of the incident at Target. Defendant has not demonstrated that the prejudice of those items' admission outweighed their probative value.

Cumulative Error

In his point VI, defendant argues that his convictions should be reversed for cumulative error. Because we have found no reversible errors among the issues raised by defendant, this argument is rendered moot. In so deciding, we recite the truism that a defendant is entitled to a fair trial, not a perfect one. State v. Marshall, 123 N.J. 1, 169-70 (1991). It is well recognized that incidental legal errors, which creep into a trial but do not prejudice the rights of a party or make the proceedings unfair, may not be invoked to upset an otherwise valid verdict. State v. Orecchio, 16 N.J. 125, 129 (1954). Courts have recognized that, even when an individual error does not constitute reversible error, a series of such errors, considered in combination, can have a cumulative effect that casts sufficient doubt on a verdict to require reversal. State v. Koskovich, 168 N.J. 448, 540 (2001). The cumulative error doctrine requires the granting of a new trial before an impartial jury when legal errors are either of such a magnitude that defendant has been prejudiced or have in the aggregate rendered the trial

unfair.  Ibid.  Based on our analysis on appeal, although error was present, it did not deprive defendant of a fair trial.

Sentencing

In his final point, defendant argues that his sentence is excessive in that the trial court should not have imposed consecutive sentences and should have found that mitigating factor four applied.  We disagree.

Appellate courts must affirm a sentence under review unless "(1) the sentencing guidelines were violated; (2) the aggravating and mitigating factors found by the sentencing court were not based upon competent and credible evidence in the record; or (3) 'the application of the guidelines to the facts of [the] case makes the sentence clearly unreasonable so as to shock the judicial conscience.'"  State v. Fuentes, 217 N.J. 57, 70 (2014) (quoting State v. Roth, 95 N.J. 334, 364-65 (1984)).  In reviewing a sentence, an appellate court should not "substitute its judgment" for that of the trial court, and a sentence imposed by the trial judge should not be upset unless it reflects an abuse of the trial court's discretion.  State v. Lawless, 214 N.J. 594, 606 (2013).  "The test is not whether a reviewing court would have reached a different conclusion on what an appropriate sentence should be; it is whether, on the basis of the evidence, no reasonable sentencing court could have imposed the sentence under review."

State v. M.A., 402 N.J. Super. 353, 370 (App. Div. 2008) (quoting State v.

Tarver, 272 N.J. Super. 414, 435 (App. Div. 1994)).

In the seminal case of State v. Yarbough, 100 N.J. 627, 643-44 (1985),

our Supreme Court adopted the following criteria for consecutive or concurrent

sentencing decisions:

> (1) there can be no free crimes in a system for which the punishment shall fit the crime;
>
> (2) the reasons for imposing either a consecutive or concurrent sentence should be separately stated in the sentencing decision;
>
> (3) some reasons to be considered by the sentencing court should include facts relating to the crimes, including whether or not:
>
>> (a) the crimes and their objectives were predominantly independent of each other;
>>
>> (b) the crimes involved separate acts of violence or threats of violence;
>>
>> (c) the crimes were committed at different times or separate places, rather than being committed so closely in time and place as to indicate a single period of aberrant behavior;
>>
>> (d) any of the crimes involved multiple victims;
>>
>> (e) the convictions for which the sentences are to be imposed are numerous;

66

(4) there should be no double counting of aggravating factors;

(5) successive terms for the same offense should not ordinarily be equal to the punishment for the first offense; and

(6) there should be an overall outer limit on the cumulation of consecutive sentences for multiple offenses not to exceed the sum of the longest terms (including an extended term, if eligible) that could be imposed for the two most serious offenses.

Here, the court sentenced defendant to nine years for second-degree sexual assault of J.Y. (count one), with an eighty-five percent period of parole ineligibility under NERA, followed by a mandatory three-year period of parole supervision. The court merged defendant's conviction for third-degree endangering the welfare of a child (count two) into his sexual assault conviction (count one). The court then imposed a consecutive nine-year sentence for the second-degree attempted kidnapping of P.H. (count five), also with an eighty-five percent period of parole ineligibility under NERA and a three-year period of parole supervision. For defendant's conviction for second-degree luring (count six) and second-degree attempted sexual assault of P.H. (count seven), the court imposed concurrent nine-year terms. On count seven, the court also imposed an eighty-five percent period of parole ineligibility under NERA and a three-year period of parole supervision. On count eight, third-degree

A-0316-22

endangering the welfare of a child, the court imposed a concurrent five-year flat term.  The court required defendant to comply with Megan's Law and sentenced him to parole supervision for life (PSL).

The court rejected defendant's argument that mitigating factor four applied due to his mental illness, noting that defendant proffered "no expert opinion or other proof that the offense conduct here was causally related to any of his mental health diagnoses."  The court further cited that defendant himself denied any wrongdoing or that he needed mental health treatment of any kind.  The court found no basis for any showing as to how defendant's mental health issues could excuse his criminal conduct and found defendant "to be quite calculating and conniving notwithstanding any mental problems he may have."

Citing the factors set forth in Yarbough, 100 N.J. at 643-44, and State v. Torres, 246 N.J. 246 (2021), the court determined that consecutive sentences for the offenses against J.Y. and P.H. were appropriate.  In applying these criteria, the court noted that defendant's offenses were "fairly close in time" but their "objectives were independent of each other" and the later crimes against P.H. "were a significant escalation" of the crimes against J.Y.  The court also found these crimes involved "separate acts of violence or threats of violence."  The court found that although the crimes were not so close in time as to be a "single

68

period of aberrant behavior," this factor only "mildly counsels in favor of consecutive sentence[s]" and was not entitled to "great weight." The court put great weight on the fact that there were multiple victims, which "weighs very, very strongly in favor of consecutive sentences." In assessing whether there were numerous offenses, the court found that this criterion not to "weigh heavily in favor of consecutive sentences."

The court acknowledged the requirement of Torres that the court address the "overall fairness" of defendant's sentence, and repeated, "I am putting tremendous weight on aggravating factors three and nine, and I do find that those two aggravating factors are substantial and they substantially outweigh the nonexistent mitigating factors."

Our review of the record reveals that the trial court comprehensively addressed the Yarbough factors, as well as the "overall fairness" of consecutive sentences, as required by the Torres Court. 246 N.J. at 268-69. We discern no error in the court's application of Yarbough and Torres. Further, the court addressed mitigating factor four in depth and found it not to be applicable. In sum, there is no justification to support defendant's requested substitution of the trial court's judgment. Lawless, 214 N.J. at 606.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M.C. Harley

Clerk of the Appellate Division

A-0316-22

**RECORD IMPOUNDED**

_____
SABATINO, P.J.A.D., concurring.

I concur in the comprehensive and well-reasoned per curiam opinion. I write separately to underscore a few important concerns regarding the role of appellate counsel in dealing with a record that, as here, contains multiple and varying transcripts of recorded conversations.

As the per curiam opinion recounts, defendant's September 11, 2015 interview at the police station was video recorded. Thereafter, three transcripts of that recording were created.

First, a staff member of the County Prosecutor's Office, who is not identified as being a certified transcriber, prepared an unofficial transcript of the interview. That unofficial transcript was reviewed and co-signed by a detective in the Prosecutor's Office. The Prosecutor's Office provided that transcript to defense counsel in discovery. A courtesy copy of the unofficial transcript was provided to the judge who presided over the suppression hearing on August 14, 2019. At that hearing, the recording was played in the courtroom. The judge denied the suppression motion in a written opinion that quoted extensively from the unofficial transcript. The unofficial transcript was eventually reproduced in defendant's appendix on appeal.

After the suppression motion was denied, counsel and the court conferred, and it was agreed that certain portions of the interview should be redacted from

the jury to omit defendant's comments about getting counsel. That redacted version was played at trial for the jury on February 2, 2022, which generated a second transcript the parties supplied on appeal.

Third, defendant's submissions on appeal initially included a transcript of the August 14, 2019 suppression hearing, but, pursuant to the transcript request form, that version omitted the words spoken during the police interview. Upon discovering the omission, this court requested counsel to provide a corrected version of the August 14, 2019 transcript that included the words spoken during the interview. A corrected official transcript containing the recorded passages was then prepared by a certified transcriber.

There are many discrepancies among the three transcripts of the interview. Those discrepancies include (1) whether at some points during the interview words were uttered at all, (2) whether they were discernable, and (3) the precise words that were uttered. Our rough count revealed more than fifty such discrepancies. The vast majority of them are minor and do not materially alter the gist of what was being said. Even so, the transcript differences raise concerns about which words are the most accurate and should control appellate review.

We are mindful that Rule 2:5-4 prescribes the manner in which an official transcript of court proceedings is to be prepared and delivered. In addition, Rule 2:5-5(a) prescribes how a party or this court, sua sponte, may pursue the review and potential correction of a transcript to determine "whether a particular portion of the transcript accurately transcribed what was said by a participant." If there is disagreement and a timely objection, a party or this court may seek a remand to the trial court to settle the disputed record. Ibid.

These processes have become more complicated in recent years with the proliferation of recordings created outside of the court and thereafter played as evidence in courtrooms. We now frequently hear appeals in which the record includes recordings with audio tracks from police body cameras, dashboard cameras, cell phones, doorbell ring cameras, police station interviews, voicemails, and other sources. As an apparent routine practice in criminal cases, some prosecutors have arranged for either private transcribers or staff members to prepare unofficial transcripts for investigatory or discovery purposes. Those "homemade" transcripts, although surely helpful to criminal motion judges and trial counsel, should not serve as a substitute for official transcripts created by certified transcribers. Discrepancies should be resolved before briefing on appeals is completed and cases are calendared and argued.

In the present case, our staff alerted counsel to the discrepancies. Counsel then conferred and advised us of their agreement regarding which transcript should be utilized on appeal and clarifying notable discrepancies. In one instance of potential consequence that we drew to their attention, counsel agreed that a statement by Detective Takacs to defendant transcribed from the trial playback as "[y]ou can tell that to your attorney" was incorrect. Counsel stipulated that, as the other two transcripts reflected, the accurate words instead were "[y]ou're entitled to your opinion." Had we not invited and received that stipulation, the discrepancy might have affected our assessment of the waiver-of-counsel issue discussed in Part II of the per curiam opinion.

As another example, the unofficial transcript contains a statement by defendant, "[a]nd [sic] I am telling you about that child is not [sic] true," whereas the hearing transcript states, "[w]hat I am telling you about that child is the truth." Counsel stipulated to have the hearing and trial transcripts control over the unofficial transcript, even though the latter was relied upon by the motion judge.

Our courts have long recognized that "[v]erbal precision is . . . important to the correct understanding of any verbal utterance, whether written or oral." State v. Kociolek, 23 N.J. 400, 421-22 (1957) (quoting Wigmore on Evidence

4

§§ 1056, 2094 (3d. ed. 1940)). Such precision is critical "because the presence or absence or change of a single word may substantially alter the true meaning of even the shortest sentence." Id. at 422.

As litigated cases become increasingly saturated with recorded evidence, it is vital that appellate counsel pay close attention to the existence of any discrepancies between or among multiple transcripts of the audio tracks in those recordings. If the trial judge who ruled on a pretrial motion was guided by and quoted from an unofficial transcript, counsel should compare those words with the official version(s) that are produced from the in-court playing of those tracks. It is essential that counsel order and obtain full transcripts of suppression hearings that contain the words on the recordings played at the hearings.

If material discrepancies are found, counsel should endeavor cooperatively to resolve the accuracy issues by agreement and then notify the court if the record needs to be settled. Quotations in appellate briefs should make explicit what version(s) of the transcripts are being cited and must indicate whether any differences exist. In rare instances, a matter may need to be remanded to the trial court to reconsider a ruling because, on closer appellate inspection, the version of the transcript that the court relied upon may be materially inaccurate.

 A-0316-22

In making these observations, I appreciate the tremendous challenges that confront professional transcribers in creating accurate transcripts of conversations that were recorded outside of court—with obstacles such as bad acoustics, poorly placed recording devices, extraneous noises (such as passing traffic, sirens, or airplanes), people speaking at the same time, accents or jargon, and other confounding variables. A "perfect" transcript of such recordings may be unattainable. I have great admiration for the skill and professionalism of transcribers. My point is that to undertake proper appellate advocacy and judicial review in our common pursuit of justice, we all need to be assured that any transcript discrepancies are addressed. The appellate court and counsel must literally be working off the same—and accurate—pages.

Given these concerns, it might be worthwhile for a court committee to consider this subject in more depth.

I hereby certify that the foregoing is
a true copy of the original on file in
my office.

*M.C. Harley*

Clerk of the Appellate Division

A-0316-22